# Commonwealth v. Sandusky

C.P. of Centre County, No. CP-14 CR-2421-2011.

Frank Fina, for Commonwealth.
Norris E. Gelman, Joseph L. Amendola, for defendant.

CLELAND, *J.*, June 4, 2012—It occasionally happens that judges are presented with complicated, even controversial, motions on the eve of trial. One such set of motions has been presented by several of the alleged victims in this case, referred to as victim numbers 3, 4, 5, and 7, and supported by an amicus brief presented by various national and state victims' organizations.

The alleged victims, who have heretofore been identified only by numbers, ask that during the trial of the case their identity be concealed, that they be permitted to use a pseudonym, and that steps be taken to restrict any distribution of their personal information.

I could rule on the motions with the entry of a summary order and without any reasoned statement to support the order. It seems unwise to do so in this case, however, because the motions have a sympathetic appeal and to dismiss them without any explanation might lead to

confusion and misunderstanding. I understand, of course, that the fuller, and final, analysis and explanation of the issue must await the considered judgment of our appellate courts, and perhaps the legislature.

While I have not formally sought the position of counsel for the Commonwealth and the defendant, I have discussed the issue with them in conferences during the progress of the case, and as recently as last Wednesday in the final pre-trial conference after these motions were filed. Counsel for the defendant has not expressed an objection to the alleged victims' request. Counsel for the Commonwealth represented to the court that they have discussed this issue with all of the alleged victims, and explained to them that it is the Commonwealth's position that the motions have no legal basis.

Having considered the issue, it is my view that there is no support in Pennsylvania law for offering anonymity to an adult witness because the witness is one of a class of victims of a particular form of crime. It may well be in a specific and unique case that a particular witness, for any number of reasons, ought to be protected with a pseudonym. But only one of the alleged victims who filed such a request in this case supported it with evidence of potential harm, and even that affidavit asserted the kinds of generalized traumatic impact from testifying that would occur to any patient in treatment.

During the pre-trial phases of this case all reasonable efforts have been made by the court and by counsel both for the defendant and Commonwealth to protect the identity of the alleged victims. That effort will continue

through jury selection. While I will make every effort to be sensitive to the nature of the alleged victims' testimony, once the trial begins the veil must be lifted.

Courts are not customarily in the business of withholding information. Secrecy is thought to be inconsistent with the openness required to assure the public that the law is being administered fairly and applied faithfully. Consequently, there must be justifications of public policy that are very deep and well-rooted to support any measure which interferes with the public's ability to observe a trial and to make their own judgments about the legitimacy of their legal system and the fairness of its results.

Under our system of criminal law charges are brought against a defendant for conduct that offends "the peace and dignity of the Commonwealth." It is old language that reflects an ancient value: ours is not a system of private retribution carried out at public expense. A criminal prosecution is not brought to vindicate the rights of only a victim of crime, but to vindicate the rights of the public as a whole to live secure and peaceful lives. A prosecutor's duty is to use the resources of the office to promote the public good in its many manifestations, not only to obtain private retribution for a specific victim.

Because the purpose of our criminal justice system is to protect our collective welfare, every citizen has a civic duty to participate in the operations of the system to assure it works for our collective benefit — as a witness, as a juror, even as an observer in the courtroom. As citizens we have certain responsibilities to protect the safety and

security of the community as a whole, and to that end each of us has a duty to the community to testify when called to do so regarding the facts of an alleged crime — no matter how personally unpleasant fulfilling that duty may be.

I understand that such theoretical considerations may be of little comfort to an alleged victim for whom the experience of testifying will be intensely personal. Nevertheless, it is important to remember why we ask witnesses to do what they do.

It is argued in the motions that for an alleged victim of a sexual assault to fulfill that responsibility is so uniquely embarrassing that the person should be protected by being able to conceal his name. But why should only that class of witnesses be protected? No victim of crime, after all, is spared the trauma of crime's effects — and the severity of the trauma does not necessarily mirror the nature of the crime. Even "minor" crime can have major psychic consequences. Arguably any victim of any crime would prefer not to appear in court, not to be subjected to cross-examination, not to have his or her credibility evaluated by a jury — not to put his name and reputation at stake. But we ask citizens to do that every day in courts across the nation.

Given the circumstances of this specific case, counsel and the court will cooperate when possible to protect the privacy of all witnesses, to protect their personal information, and to be sensitive to challenges presented by the nature of the testimony that will be offered.

Of course, it is also to be hoped that various news organizations that will report on the trial will use what has

become their professional custom to protect the privacy of alleged victims.

Therefore, I enter the following: ·

## ORDER

And now, June 4th, 2012, in consideration of the foregoing, it is ordered as follows: The motions of alleged victims 3, 4, 5, and 7 requesting that they be permitted to testify using a pseudonym is denied.

The defendant has filed a motion asking that I direct the Commonwealth to permit him to copy all juror information collected by the Office of Attorney General in its preparation for jury selection.

He asserts that "it is fundamentally unfair and a violation of his due process and equal protection rights under both our state and federal constitutions" if the Commonwealth has used its "unlimited investigative, financial, and governmental resources" to collect juror background information and does not share it with him. (Defendant's motion, para. 19).

In support of his request for information "which he believes may be in the possession of the Commonwealth" (para. 24) (emphasis added), he has attached to his motion an anonymous letter containing what is purported to be an account of what information the Commonwealth has collected. The defendant argues that although the letter is anonymous it bears some indicia of credibility because attached to it is a copy of a letter which was attached to the jury pool list when it was distributed to counsel.

In reply, the Commonwealth denies that it had its "investigators improperly peering into their (jurors') private lives." (Commonwealth Response, p.2). The Commonwealth argues that any information it has collected is no more "than what any diligent defense attorney would collect." (ftn. 2); that its background material is protected from disclosure by the work product privilege; and the defendant's motion is factually baseless.

Defense counsel asks that I schedule a hearing on his motion to permit him to inquire whether or not the Commonwealth has collected information which should be provided to the defense. In an exchange of e-mails between the court and counsel, defense counsel acknowledges, as I understand it, that he believes the anonymous letter is credible but he can produce no witness who can testify in support of the allegations of his motion. Instead, he proposes to call as a witness an attorney for the prosecution, as on cross-examination, and inquire about the collection of any such juror background information.

The first question to be addressed is whether an anonymous letter to defense counsel asserting how the Commonwealth has used its investigative, governmental and financial resources triggers the right to have a hearing to permit defense counsel to investigate whether the statements in the letter are true.

The act of filing a motion does not necessarily entitle a party to a hearing. Rule 575(A)(2)(c) of the Pennsylvania Rules of Criminal Procedure (Pa.R.Crim.P.) requires

any motion to "state with particularity the grounds for the motion" and "the facts that support each ground." Subsection (g) continues that "if the motion sets forth facts that do not already appear of record in the case, the motion shall be verified by the sworn affidavit of some person having knowledge of the facts, or by the unsworn written statement of such a person that the facts are verified subject to the penalties for unsworn falsifications under the crimes code...."

In short, a motion filed by counsel must be supported by allegations of fact backed up with some credible basis to believe the allegations to be true, otherwise the court and counsel can be engaged in chasing chimeras.

The defense motion is not supported by either verification or affidavit regarding the truth of the underlying facts it alleges, as required by Pa.R.Crim.P. 575. Therefore, I will decline to hold a hearing at which defense counsel would attempt to develop facts to support his allegations. The design of the rules intends that counsel must have some factual basis to support a motion before it is filed and not attempt to develop those facts after it is filed.

The Commonwealth further argues that any juror background information it had developed is protected by the "attorney work product privilege" and need not be turned over to the defense.

It is "black letter law" and requires no citation to authority to state that a court is not required to hold a hearing when the facts alleged in the petition, even if proven to

be true, would not entitle the petitioner to the requested relief. Even if the facts as alleged in the defense motion were correct, I do not believe, under the current state of the law, that the defendant would be entitled to the relief he seeks — access to the Commonwealth's jury research — because the defense simply has no constitutional due process right to get the information.

Jury background information, at least to the extent the defense asserts it has been collected by the Commonwealth in this case, is subject to the work product privilege.

There is very little case law on point, and much of it predates the modern view that the Commonwealth has a duty under *Brady v. Maryland*[1] and its progeny, as embodied in our rules of criminal procedure, to disclose certain types of information.[2]

The work product privilege was established in *Hickman v. Taylor*, 329 U.S. 495 (1947) in recognition that in preparing a client's case it is necessary for an attorney to maintain a "certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel." *Id.* at 510-511. An attorney's collection of jury background material clearly falls within the category of

---

1. 373 U.S. 83 (1963).

2. The cases have more historical interest than precedential value. *Commonwealth v. Caplan*, 192 A.2d 984 (Pa. 1963); *Commonwealth v. Foster*, 280 A.2d 602 (Pa. Super. 1971); *Commonwealth v. Smith*, 326 A.2d 60 (Pa. 1974); *Commonwealth v. Schowalter*, 352 A.2d 456 (Pa. Super. 1974); *Commonwealth v. Galloway*, 352 A.2d 518 (Pa. Super. 1975). They demonstrate, however, how far the law has come in requiring counsel to share information to avoid surprise at trial and facilitate preparation. "....the taboo against the 'fishing expedition' has yielded increasing to the proposition that the ends of justice require a wider availability of discovery than in the past." McCormick on Evidence, 6th ed. p. 166.

"work product" under Pennsylvania law. Pa.R.Crim.P. 573 (G); *Commonwealth v. Kennedy*, 583 Pa. 208, 876 A.2d 939 (Pa. 2005).

But categorizing material as "work product" does not necessarily mean it is not discoverable by opposing counsel under sixth amendment due process considerations. The work product privilege is not absolute. "It is an intensely practical one, grounded in the realities of litigation in our adversary system." *United States v. Nobles*, 422 U.S. 225, 238 (1975).

One must ask, therefore, whether it transcends due process to permit the prosecutor to develop juror information that a defendant cannot afford to produce on his own? As a practical matter, this is the question that underlies the defense motion. The question implicates an examination of the boundaries of due process, but the boundaries of due process are not easily fixed. Due process is not a static concept: it evolves over time. Nevertheless, the defendant has cited no case law to support his request.

The desire to collect information about prospective jurors has gone on from the days of the origins of the jury system. It is part of our human nature to want to know something about the people who will be making judgments that affect us — political officials, sports referees, judges, and certainly jurors, among others. Indeed, it may be argued that counsel, in fulfilling their duty of candor to the court, have a duty to make some level of inquiry, either before or during voir dire, regarding whether prospective

jurors are qualified under the law to serve.[3]

Our system of justice depends on a jury composed of citizens who take an oath to "well and truly" try the matter before them. As a society, we rely on our fellow citizens to reach a verdict based on the evidence presented in the courtroom. While it may be theoretically helpful to have background information that might be used to predict how a particular juror might view the issues in a particular case, and then apply that knowledge to select jurors perceived to be favorable to one side or the other, the practical fact is that jurors are not automatons.

We should not lose sight of the fact that the social dynamic of the jury tends to subsume individual opinions into the collective analysis of the whole, thereby lessening the impact of any one juror and decreasing the importance of knowing with precision their individual backgrounds. Indeed our faith in the jury system is predicated on that premise.

A juror's opinions are shaped by many things: life experiences, age, sex, marital status, education, employment, among others — but ultimately our society's faith in the jury system rests on the sure confidence that the jury's collective judgment is shaped by the deliberative process of sifting and sorting evidence that has been presented in a courtroom according to the longstanding law of evidence, and guided by the judge's instructions about the application of the law.

Jurors enter into their deliberations carrying with

---

3. 42 Pa.C.S. 4502

them not just their own unique life experience, but also their shared experience during the trial. As a result, the jury becomes a unique social institution and takes on a life of its own. The individual opinions of its independent members become melded into a collective expression of the community's wisdom — the jury's verdict.

Each side in a trial rightfully attempts to select jurors it thinks will bring some unique perception, experience, or understanding to that side's theory of the case, and hoping the juror will be helpful to it in some way. Predicting, however, how any one person will vote in the jury room is far from an exact science, and, therefore, refusing to order the Commonwealth to share such information cannot be said to be fundamentally unfair. As a result, even if the Commonwealth collected the information in this case in the manner the defense asserts and which the Commonwealth denies, I do not believe that the information is constitutionally required to be turned over to the defense; and the motion asking me to do so will be denied.

## ORDER

And now, June 4, 2012, in consideration of the foregoing memorandum, and upon consideration of the defendant's motion to compel the commonwealth to provide defendant with requested pre-trial discovery materials, filed May 30, 2012, and the Commonwealth's response, it is ordered as follows:

Motion denied.

"Non-party media entities"[4] (referred to in this memorandum collectively as "media") have filed an expedited motion to intervene and to clarify the court's May 30, 2012 decorum order which, in part, controls conduct of reporters in the courtroom during the trial of this case. Specifically Media seeks a clarification of paragraph 7 of the order regarding the use of electronic devices.

For reasons explained in this memorandum, the motion to intervene will be granted, but the motion to clarify the decorum order will be denied. The decorum order, however, will be modified in response to the media's motion.

Factual Background:

On May 30, 2012 I entered a "decorum order governing jury selection and trial." The order establishes policies for the public and press who wish to attend the trial in this matter. Specifically regarding the media, the order details, among other things, the allocation of reserved media seating in the courtroom, the creation of a satellite courtroom reserved exclusively for media use, location of interviews, permission for reporters to carry backpacks into the courtroom, press credentialing processes, and a procedure to assign pool reporters to cover jury selection.

_____

4. They are ABC, Inc. (on behalf of WPVI-TV), Advance Publications, Inc. (publisher of the *Harrisburg Patriot-News*), The Associated Press, CNN, *The Daily Collegian, Dow Jones & Company, Inc.* (publisher of *The Wall Street Journal),* Dow Jones Local Media Group, Inc. (publisher of *The Pocono Record*), ESPN, NBCUniversial, Inc. (on behalf of WCAU-TV), The New York Times Co. (publisher of *The New York Times*), Philadelphia Media Network, Inc. (publisher of *The Philadelphia inquirer*), the Scranton Times, L.P. (on behalf of *the Citizen's Voice and Standard-Speaker),* and Tribune Company (on behalf of *The Morning Call*).

The text of the full order is available on the court's website: www:co.centre.pa.us/media.

Paragraph of the May 30, 2012 decorum order reads as follows:

7. Electronic Devices:

a.  No member of the public will be permitted to posses in courtroom 1 any cell phone, laptop computer, smart phone, or similar electronic device. Anyone possessing such a device will not be permitted to pass security and enter the courthouse.

b.  Only reporters with proper credentials, as determined by the Sheriff, will be permitted to possess or use in courtroom 1 or the satellite courtroom any cell phone, laptop computer, smart phone, or similar electronic device. Such devices may be used during trial for electronic based communications. However, the devices may not be used to take or transmit photographs in courtroom 1 of the satellite courtroom; or to record or broadcast any verbatim account of the proceedings while court is in session. (emphasis in the original).

The decorum order was entered after I met on May 15, 2012 with reporters representing both the print and electronic media in a committee formed by the Pennsylvania Association of Broadcasters ("PAB") and the Pennsylvania Newspaper Association ("PNA") which was created to anticipate and resolve media coverage issues that might arise during trial. I had also met previously with technical representatives of the electronic media to

understand their concerns about coordinating the parking of satellite uplink trucks, problems in running electronic cabling, and Internet connectivity issues.

These meetings were part of an on-going series of media-court meetings that began even before the preliminary hearing in this case. The original decorum order, which controlled the preliminary hearing arrangements,[5] was entered on December 6, 2011 and was drafted with considerable, and appreciated, technical assistance from the PAB and the PNA. The original order, which prohibited any form of electronic communications from the courtroom, was subsequently modified to permit it in an order dated December 12, 2011.

The essential terms of that order have remained in place and have governed each subsequent hearing and argument that I have conducted since the preliminary hearing. At the beginning of each hearing I have cautioned all reporters present in the courtroom that the order prohibited the simultaneous, verbatim transmission of any proceedings in the courtroom, and that a violation of the prohibition could result in sanctions including loss of media credentials for the reporter and his or her media outlet. (See, for example, the order date February 6, 2012; paragraph 1(d)(iii): "...Such devices, however, may not be used to take or transmit photographs in the courtroom, or to record or transmit any verbatim account of the proceeding.")

---

5. While the preliminary hearing was conducted by The Hon. Robert Scott, the Decorum Order was entered on my authority as the assigned trial judge.

Controlling Authorities:

The Supreme Court of Pennsylvania has promulgated Rule of Criminal Procedure 112. The Rule is titled: "publicity, broadcasting, and recording of proceeding."

Paragraph (A) of the rule provides:

"The court or issuing authority shall:

(1) prohibit the taking of photographs, video, or motion pictures of any judicial proceedings or in the hearing room or courtroom or its environs during the judicial proceeding; and

(2) prohibit the transmission of communications by telephone, radio, television, or advanced communication technology from the hearing room or the courtroom or its environs during the progress of or in connection with any judicial proceeding, whether or not the court is actually in session."

Paragraph (C) of the Rule provides:

"Except as provided in paragraph (D)[6], the stenographic, mechanical, or electronic recording, or the recording using any advanced communication technology, of any judicial proceedings by anyone other than the official court stenographer in a court case, for any purpose, is prohibited." In addition, canon 3(7) of the code of judicial conduct, also adopted by the Supreme Court of Pennsylvania, reads:

---

6. Paragraph (D) is not relevant to the present discussion.

"Unless otherwise provided by the Supreme Court of Pennsylvania, judges should prohibit broadcasting, televising, recording or taking photographs in the courtroom and areas immediately adjacent thereto during sessions of court or recesses between sessions...."

While the literal text of rule 112 and canon 3(7) might be read to prohibit electronic based communications such as tweeting and texting, I determined that the rule must be read in the context of a definition of the term "broadcasting" since the title of rule 112 specifically uses that word, as does canon 3. In the context of the rule and the canon, my interpretation of the term "broadcast" meant that it prohibited the simultaneous transmission of a verbatim account of the proceeding and, therefore, the rule would not prohibit tweeting or texting as long as the communication did not include a verbatim account. As noted, I have cautioned reporters at each argument or hearing of this restriction.

While several other Pennsylvania trial judges have adopted similar interpretations of the rule and canon and permitted tweeting, micro blogging or similar electronic communication from the courtroom, the Criminal Procedural Rules Committee described this as a "misinterpretation" of the rule. Personal Communications Devices in the courtroom report dated 1/10/2012, p. 24. The committee's report sought comment on a proposed rule that would explicitly ban such conduct.

Because my interpretation of the term "broadcast" would not include a prohibition of electronic communication per se, I concluded that whether to permit

electronic communication, and in what form, was left to the sound discretion of the trial judge. It could reasonably be anticipated that given the definition of "broadcast" as I applied it a judge's decision about whether to permit such electronic communication could vary from trial to trial, even during a trial, and depend on a variety of factors that might impact the judge's ability to assure a fair trial could be conducted.

Media Motion:

The media motion recites that their representatives, upon questioning the court communications manager of the administrative office of Pennsylvania, were advised that verbatim accounts of what was said in court were prohibited by the decorum order.[7] (para. 4). The motion then asserts, "The AOPC's interpretation is inconsistent with the text of the order and this court's previous orders governing pretrial proceedings...." (para. 5).[8]

The media argues "the use of such (direct) quotations in the electronic based communication from the courtroom should not be restricted because:

It would "risk diminishing the accuracy of reports on the trial." (para. 7).

Prohibiting the use of direct quotations is impractical and difficult to implement and "(t)here is no workable way for reporters to avoid using any direct quotes in

7. The Decorum order specifically provides that media inquiries should be directed to that office.

8. In fact, the advice given by the Communications Manager was precisely consistent with both my previous written orders and my verbal directions to reporters in open court.

their text-based reports..." (para. 8).

"Using direct quotes in reports from the courtroom does not prejudice any interest or in any way impede the judicial process." (para. 9).

"(A)ny restriction on reporting direct quotations would be unconstitutional." (para. 10).

The bullet points merely summarize the more extended arguments made in support of the Media's request that I clarify paragraph 7 of the decorum order. The Media seeks assurance that they may "include direct quotations from the proceedings in their electronic based communications while court is in session." (wherefore clause).

Analysis:

While I was comfortable with my interpretation of Rule 112 and Canon 3(7), I clearly understood that my definition of "broadcast" might be pushing the boundaries of the Rule and Canon to their limits. Clearly the Criminal Rules Committee thought so.

Permitting reports from the courtroom while court is in session did not, in my view, constitute "broadcasting" as long as the reports did not contain simultaneous verbatim quotations. It is readily apparent from the allegations in the Media's motion, however, that the standard I applied in my definition is confusing to reporters, unworkable, and, therefore, likely unenforceable.

If reporters are permitted to electronically transmit reports from the courtroom while court is in session and which contain verbatim accounts of the proceedings, it

cannot be considered anything other than exactly the kind of broadcasting explicitly prohibited by the rule.

Therefore, based on the Media's own arguments, I am compelled to rescind paragraph 7 of the decorum order. While I will permit reporters to bring their electronic "tools of the trade" into courtroom 1 and the satellite courtroom, they must not be in a mode that permits transmission of any form of communication to any person or device either in or out of the courthouse or courthouse annex.

Accordingly, I enter the following:

ORDER

And now, June 4, 2012, in consideration of the foregoing, it is ordered as follows:

1. The non-party media entities motion to intervene is granted.

2. The requested relief is denied.

It is hereby further ordered that Paragraph 7 of the decorum order dated May 30, 2012 shall be amended to specifically provide that while credentialed reporters admitted to courtroom 1 or the satellite courtroom may possess and use specified electronic devices as "tools of the trade" such devices shall not be set in a mode that permits transmission of any form of communication to any person or device either in or out of the courthouse or courthouse annex.